**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **CAPP, INC.,** et al., on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>   v.<br><br>**DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, AND DISCOVER BANK**,<br><br>            Defendants. | Case No. 1:23-cv-04676 |
| **LEMMO'S PIZZERIA, LLC**, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>   v.<br><br>**DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, DISCOVER BANK, AND DOES 1–100**,<br><br>            Defendants. | Case No. 1:23-cv-14250 |
| **SUPPORT ANIMAL HOLDINGS, LLC,** et al., individually, and on behalf of all other similarly situated,<br><br>            Plaintiffs,<br><br>   v.<br><br>**DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, DISCOVER BANK, AND DOES 1–100**,<br><br>            Defendants. | Case No. 1:23-cv-15297 |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................2

    A.    Credit Card Transactions, Interchange Fees, and the Parties' Relationships To Each Other...................................................................................................2

    B.    Discover Discloses a Credit Card Classification Issue. .......................................4

    C.    Plaintiffs File Putative Class Action Lawsuits. ...................................................5

    D.    The Proposed Settlement........................................................................................6

I.    IF THIS CASE DID NOT SETTLE NOW, PLAINTIFFS FACED SIGNIFICANT LITIGATION CHALLENGES................................................................8

    A.    Discover Previously Promised to Provide Broad Relief, and Class Members Would Not Secure a Better Outcome Through Further Litigation. ............................................................................................................8

    B.    The Claims of Plaintiffs and Many Class Members Would Have Been Subject to Binding Arbitration..............................................................................9

    C.    Plaintiffs Would Have Been Unlikely to Prevail on the Merits. .........................10

        1.    Plaintiffs' RICO Claims Could Not Succeed..........................................10

        2.    Plaintiffs' State Law Claims Would Not Succeed. .................................12

II.    THE SETTLEMENT PROVIDES AN APPROPRIATE VEHICLE TO PROVIDE RESTITUTION TO AFFECTED ENTITIES. .............................................13

CONCLUSION.............................................................................................................15

i

The Discover defendants—Discover Financial Services, DFS Services LLC, and Discover Bank (collectively, "Discover")—submit this memorandum to provide additional context surrounding the parties' proposed nationwide class-action settlement.

## INTRODUCTION

These lawsuits were triggered by Discover's disclosure that it had incorrectly classified certain Discover credit card accounts into a commercial interchange tier. This issue did not affect Discover cardholders. Instead, it affected the interchange fees paid by businesses involved in processing Discover credit card transactions. In July 2023, Discover made clear that the company was working to "prepare a program to compensate affected direct merchants and merchant acquirers" and that it was doing so "in discussions with regulators regarding this matter."[1]

The Settlement in this case reflects months of efforts by Discover to fulfil its promise. The Settlement proposes to pay class members based on a restitution methodology that reflects a reasonable estimate of the full amount of excess interchange fees paid by those involved in processing a misclassified transaction, plus interest.

The Settlement also reflects the parties' agreement that a class-wide settlement, which includes a court-approved claims process, is an appropriate mechanism for distributing these restitution payments to affected businesses. As explained below, not every entity involved in processing Discover credit card transactions paid excess interchange fees. And Discover's records generally do not allow it to determine *which* entities paid excess interchange fees; the information to do so is held by third parties. Furthermore, given the time period at issue, Discover lacks contact information for many class members, so it cannot directly distribute settlement payments to the

---

[1] *Discover Financial Services Reports Second Quarter 2023 Net Income of $901 Million or $3.54 Per Diluted Share* (July 19, 2023), available at https://investorrelations.discover.com/newsroom/press-releases/press-release-details/2023/Discover-Financial-Services-Reports-Second-Quarter-2023-Net-Income-of-901-Million-or-3.54-Per-Diluted-Share/default.aspx ("July 19 Press Release").

vast majority of the Settlement Class. The Settlement therefore creates a process by which a third-party settlement administrator will collect and analyze information provided by Discover and affected class members and distribute settlement payments.

This Court should promptly grant preliminary approval to the Settlement, so that notice can be provided to the Settlement Class and the parties can begin collecting information from class members necessary to distribute restitution payments to class members. It is rare that a class-action settlement will distribute 100 percent of restitution that a putative class may potentially be entitled to plus interest, but that is what this Settlement proposes to do. Even if Plaintiffs were to succeed on their claims—and there are many reasons to believe they could not do so—the Settlement allows class members to receive restitution far earlier than they would via litigation.

## BACKGROUND

### A. Credit Card Transactions, Interchange Fees, and the Parties' Relationships To Each Other.

There are multiple individuals or entities involved in most credit card transactions:

1. The **consumer**, who elects to pay for a purchase with a credit card. Consumers are not affected by the claims in this case.

2. The **consumer's issuing bank**, which issues the credit card to the consumer and "maintain[s] the cardholder relationship." Defendant Discover Bank is the issuing bank for Discover credit cards.

3. The **network**, which facilitates the credit card transaction by communicating financial information from the consumer's issuing bank to acquirers and vice-versa. Defendant DFS Services is the network that processes transactions involving Discover Credit Cards.

4. The **acquirer**, which maintains the "merchant relationship" and acts as an intermediary between some merchants and the network; and

5. The **end merchant**, which agrees to accept credit cards from consumers as payment for purchases. Some merchants (known as "direct merchants") may reach these agreements directly with a network, while others (known as "indirect merchants") may establish indirect relationships with a network via an acquirer.

6. In some cases, the **payment intermediary**, which is neither a merchant acquirer nor an end merchant, but acts as an intermediary between those entities.

The proposed settlement class in these lawsuits is comprised of end merchants, acquirers, and payment intermediaries involved in processing or accepting a misclassified card transaction from January 2007 to December 2023. For the majority of the merchants in the putative class, acquirers (and at times, payment intermediaries) act as an intermediary between Discover and "indirect" merchants. The acquirers accept, process, and settle credit card transactions by collecting cardholder transaction data from plaintiffs and other merchants, initiating that data into networks such as DFS Services, receiving payment from issuing banks including Discover Bank, and ultimately paying plaintiffs and other merchants.

The fees that merchants pay to their payment intermediaries and/or acquirers and that DFS Services collects are equally complex. No Discover entity charges any fees to indirect merchants. Rather, DFS Services (as a network) charges acquirers different "interchange fees" depending on the "card product type" or "tier" of Discover credit card used in a transaction.

The credit card's "tier" is determined by Discover Bank as an issuing bank. During the class period, Discover offered commercial cards and up to four types of consumer credit cards: Core, Rewards, Premium, and Premium Plus. DFS Services may charge lower interchange fees to process credit cards that Discover Bank classifies as Core cards; a higher fee for cards that it classifies as Rewards and Premium; and it may charge higher fees for cards that it classifies as Premium Plus and Commercial. The exact fee that DFS Services charges is subject to individual negotiations between DFS Services and its acquirers.

The fees that acquirers and/or payment intermediaries charge indirect merchants, in turn, are the subject of separate contracts between those entities. As a result, the fees that DFS Services charges acquirers are not necessarily passed through by the acquirers to merchants. For example, smaller merchants may be charged a flat fee by their acquirer no matter what "tier" credit card the

customer uses. Discover is not involved, and has no knowledge of, the fee arrangement between a merchant and its acquirer.

In some instances, DFS Services may negotiate a card processing and fee relationship directly with merchants. These "direct" merchants negotiate directly with DFS Services the fee they will pay to process Discover transactions and represent a small portion of the Settlement Class.

### B. Discover Discloses a Credit Card Classification Issue.

In April 2023, Discover announced that it was "currently engaged in a review of Discover Bank's card product classification procedures (which determine how certain credit cards are assigned to network product categories) and related risk management and governance issues." DSF 10-Q (Apr. 25, 2023) at 29.[2] A few months later, in July 2023, Discover reported that beginning around mid-2007, Discover Bank had "incorrectly classified certain credit card accounts into [the company's] highest merchant and merchant acquirer pricing tier," affecting pricing for "certain merchants and merchant acquirers, but not for cardholders." July 19 Press Release. Discover said it was "taking actions to correct the card product misclassification going forward and to prepare a program to compensate affected direct merchants and merchant acquirers," *id.*, and that it was "in discussions with regulators regarding this matter." *Id.*

How card accounts were classified potentially affected merchants in two ways. Some card accounts were classified into a *higher* pricing tier than was otherwise appropriate, *i.e.*, merchants may have been *overcharged* for processing transactions on these accounts. Other card accounts were classified into a *lower* pricing tier than they otherwise could have been, *i.e.*, merchants may have been charged less for processing transactions on these accounts than they otherwise could

---

[2] Available at https://investorrelations.discover.com/investor-relations/financials/sec-filings/default.aspx.

have been.

Discover does not know for certain the amount of undercharges or overcharges borne by each indirect merchant, payment intermediary, and merchant acquirer involved in processing an affected transaction. As mentioned above, the pricing terms of those merchants are governed by contracts between those merchants, payment intermediaries, and their acquirers. Discover does not have access to those contracts. Nor does Discover know whether (for example) an acquirer that paid an overcharge passed along some or all of that overcharge to merchants.

By November 2023, Discover had reclassified all active Discover Card accounts that previously were classified improperly as commercial into a consumer card. Discover has also taken appropriate action to ensure that, going forward, cards are properly classified. Discover further invested substantial resources in 2023 and 2024 into determining the scope of the classification problem, reclassifying misclassified accounts, identifying affected merchants, and developing a claims process and a restitution plan that accounted for these challenges.

**C.      Plaintiffs File Putative Class Action Lawsuits.**

The same day as Discover's July 2023 announcement, the *CAPP* Plaintiffs filed a putative class action lawsuit asserting federal RICO and related state-law claims, and lawsuits from the Plaintiffs in *Lemmo's* and *Support Animals* shortly followed. All of these claims were based on the misclassification conduct disclosed by Discover. By October 2023, the three pending cases were consolidated in the Northern District of Illinois and assigned to this Court. All lawsuits rest on allegations that Plaintiffs were injured because they accepted Discover credit cards and were thus unlawfully charged inflated interchange fees.

Given that Discover had announced its intention to "prepare a program to compensate affected" entities before the first lawsuit was filed, this was not a case that made sense for any party to litigate. Beginning in early 2024, the parties engaged in arms-length settlement

negotiations. These sessions included three in-person, all-day mediation sessions facilitated by retired federal magistrate judge Hon. Jay Gandhi on February 13, March 21, and May 14. On June 28, 2024, after months of extensive negotiations, Discover and the Settlement Class Representatives executed the Settlement Agreement.[3]

### D. The Proposed Settlement.

Plaintiffs' motion summarizes the key terms of the proposed settlement. *See Capp*, Dkt. No. 59 & 59.1 ("Settlement"). The centerpiece of the Settlement is Discover's commitment to compensate affected entities using the restitution methodology set forth in Exhibit B to the Settlement Agreement. Discover has agreed to do so by paying at least $500 million, and in an amount up to approximately the full amount that Discover believes could be owed to affected entities under its restitution methodology (which includes interest). Settlement §§ 2.37, 2.79.

The restitution methodology was the product of significant work by Discover. The methodology reflects Discover's effort to determine the amount that each "merchant identifier code"—a code corresponding to a particular merchant account—was impacted by the misclassification issue. *Id.* § 2.33. Multiple entities—such as an acquirer and a merchant—usually are associated with a merchant identifier code. Likewise, a single merchant may be associated with multiple merchant identifier codes, because merchant identifiers are assigned by merchant acquirers and merchants may change acquirers over time. *Id.*

The methodology calculates the difference between the estimated amount charged for Discover Card transactions improperly classified as Commercial from January 1, 2007–December 31, 2023, and the estimated amount that would have been charged for such transactions had the

---

[3] Two of the original Plaintiffs, KMJA Day Camps, Inc. and Support Animal Holdings LLC, are not proposed class representatives because there was no evidence that they had processed a transaction that had been incorrectly classified into a higher product tier.

transaction been properly classified. *Id.* § 3.5 & Ex. B. These amounts are estimates because, among other things, Discover no longer has reliable transactional data from before 2016 due to its data retention policy, and it does not necessarily know how long merchants processed Discover credit cards. As a result, the methodology incorporates reasonable assumptions that are intended to estimate the full amount of excessive interchange fees charged to each merchant identifier account. *See* Settlement, Ex. B §§ 2.1–2.3.

Importantly, the restitution methodology has been vetted by Plaintiffs' counsel and their experts and was finalized after the parties' mediation sessions. The methodology also has been accepted by some of Discover's largest and most sophisticated customers, who have already entered into settlements with Discover based on the methodology and therefore are excluded from the proposed settlement class.

Critically, the restitution methodology puts many affected class members in a better position than they would be if this case were to proceed to litigation. As noted above, depending on how cards were classified, some class members were charged more than they should have been. But other class members were charged less than they could have been, if the cards they processed had been categorized differently. The restitution methodology ignores the fees associated with these latter transactions entirely. In other words, the methodology proposes to compensate class members based on the gross amount overcharges they paid, ignoring the net impact of any classification that could have resulted in class members paying less than if transactions had been classified differently.

## PROCEDURAL STANDARD

"Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002) (cleaned up). At this stage, this Court's inquiry is limited to determining whether this

Court should give direct that notice of the settlement be given to the proposed settlement class. *See* Fed. R. Civ. P. 23(e). This Court "must" direct notice to be given if it concludes "that the court will likely be able to" approve the settlement. Fed. R. Civ. P. 23(e)(1)(B); *see also In re TikTok, Inc., Consumer Priv. Litig.*, 565 F. Supp. 3d 1076, 1083 (N.D. Ill. 2021) ("[T]he court must determine whether it 'will likely be able' to certify the putative class for purposes of judgment on the proposed settlement" and "whether the proposed settlement is 'within the range of possible approval' with regard to the criteria set forth in Rule 23(e)(2)").

## ARGUMENT

### I.    IF THIS CASE DID NOT SETTLE NOW, PLAINTIFFS FACED SIGNIFICANT LITIGATION CHALLENGES.

Discover entered into the Settlement Agreement because it is committed to providing full restitution to entities affected by the misclassification issue, and the parties' settlement provides an efficient and court-approved vehicle to do so. The Settlement therefore reflects a better outcome for the putative class than litigation for three key reasons: (1) affected entities will receive at or around the most they could have recovered through further litigation, even if the litigation was completely successful, (2) there is a high likelihood that arbitration, not court, would be the proper forum to litigate these claims, and (3) Plaintiffs' claims had fatal deficiencies on their merits.

#### A.    Discover Previously Promised to Provide Broad Relief, and Class Members Would Not Secure a Better Outcome Through Further Litigation.

On July 19, 2023, Discover committed "to prepare a program to compensate . . . direct merchants and merchant acquirers" affected by the card classification issue. July 19 Press Release. Where a remediation process results in a plaintiff getting "all of the requested relief to which she is legally entitled, there is no longer the requisite case or controversy, and the court is without jurisdiction." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1125 (7th Cir. 1996); *see also Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012) (dismissing putative class-

action lawsuit involving an automobile defect, where the court noted that a nationwide recall that provided the relief sought).

A class-action lawsuit provides an appropriate mechanism to fulfill Discover's promise to compensate affected entities. If this case proceeded, Plaintiffs would not have been able to obtain any better relief for the putative class through protracted litigation. They certainly could not have delivered any such relief in a more timely fashion.

B.      **The Claims of Plaintiffs and Many Class Members Would Have Been Subject to Binding Arbitration.**

Despite Plaintiffs' attempt to push their claims forward in federal court, it is likely that they—and other settlement class members—are required to arbitrate their claims. Indirect merchants like Plaintiffs frequently agree to terms with their acquirers that contain arbitration agreements that encompass the Plaintiffs' claims against Discover. Although the parties settled the litigation in the infancy of discovery, Discover had already identified numerous agreements from Plaintiffs' acquirers that required Plaintiffs to settle disputes through binding individual arbitration and barring their claims from federal court, including putative class claims. *See Capp*, Dkt. No. 24 at 3–7. If these cases proceeded, Plaintiffs' and settlement class members' claims are thus likely subject to arbitration because non-signatory defendants—such as Discover—may compel arbitration of claims that are inextricably intertwined with a contract containing an arbitration agreement. *See Hughes Masonry Co. v. Greater Clark Cnty School Bldg. Corp.*, 659 F.2d 836, 838–41 & n.9 (7th Cir. 1981) (Plaintiff is "estopped from denying [non-signatory defendant] the benefit of the arbitration clause with regard to claims that are . . . intimately founded in and intertwined with the underlying contract obligations.").

The availability of an arbitration defense would significantly delay the availability of any classwide relief. Accordingly, absent this early settlement, Discover would have pursued motions

to compel arbitration, as this Court directed the parties to do. *See id.*, Dkt. No. 28. Even if Discover's motion to compel arbitration were initially unsuccessful, Discover is entitled to an immediate appeal as of right, *see* 9 U.S.C. § 16(a)(1), and filing that appeal would stay all proceedings in the district court. *See Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023).

### C. Plaintiffs Would Have Been Unlikely to Prevail on the Merits.

Plaintiffs' claims also suffer from numerous deficiencies on the merits that, if this case proceeded, meant they would have been unlikely to recover anything.

### 1. Plaintiffs' RICO Claims Could Not Succeed.

If Plaintiffs proceed with their lawsuit, this Court would likely have dismissed the RICO claim. This is not one of the rare cases in which a RICO claim has been successfully asserted, but is instead one of the "attempts to turn routine commercial disputes into civil RICO actions" the Seventh Circuit has cautioned against. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992). The RICO claims suffer from at least three fatal flaws.

*First*, Plaintiffs will not be able to establish that "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Plaintiffs must identify "actions undertaken on behalf of the *enterprise* as opposed to on behalf of [the defendants] in their individual capacities, to advance their individual self-interests." *United Food & Commercial Workers Union & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013). Plaintiffs allege a RICO enterprise consisting of the three Discover entities and the acquirers. *CAPP* Compl. ¶ 53. Including the acquirers in the enterprise is crucial to Plaintiffs' ability to maintain a RICO claim, because the Discover entities cannot form an enterprise on their own. *See Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 934 (7th Cir. 2003).

However, Plaintiffs cannot show that Discover and the acquirers share a common purpose.

Now all parties understand that, like other class members, acquirers also were affected by the misclassification issue. There can be no common purpose when the entities who purportedly are part of the alleged enterprise were harmed by that enterprise.

*Second*, even if Plaintiffs could establish a RICO enterprise, their RICO claims will still fail because Plaintiffs cannot show that Discover committed two or more RICO "predicate acts." *See* 18 U.S.C. § 1961(5). For example, Plaintiffs assert that Discover committed mail and wire fraud by submitting "invoices that falsely and fraudulently misrepresented the number of transactions and sales volume in terms of dollars that were subject to higher commercial interchange fees." *CAPP* Compl. ¶ 62. But simply mailing invoices is insufficient to give rise to a fraud claim. *See Uni\*Quality, Inc. v. Infotronx, Inc.*, 1991 WL 420028, at \*1 (N.D. Ill. Oct. 9, 1991), *aff'd,* 974 F.2d 918 (7th Cir. 1992) (invoices do not qualify as mail fraud even when allegedly designed to trick recipients); *Ellis v. JPMorgan Chase & Co.*, 752 F. App'x 380, 383 (9th Cir. 2018) (affirming dismissal of fraud claim predicated on invoices).

*Third*, Plaintiffs cannot satisfy RICO's proximate causation requirement. Civil RICO damages claims require "a direct causal connection" between the predicate offense and the alleged harm. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459–60 (2006). Here, Plaintiffs cannot establish that the misclassification issue *directly* caused their injuries because Discover does not set the fees Plaintiffs paid. At best for indirect merchants like Plaintiffs, any misclassified cards would only result in inflated fees *charged to the acquirers*. Plaintiffs speculate they were ultimately injured because the acquirers may have charged them higher fees in turn. But any injury to Plaintiffs that follows from misclassifying credit cards is an "indirect" or "derivative" injury that the Seventh Circuit has held is not recoverable under RICO. *See Carter v. Berger,* 777 F.2d 1173 (7th Cir. 1985) ("The indirect purchaser recovers nothing, even if it bore the whole

overcharge and even if the direct purchaser did not sue."). Thus, any class member who does not have a direct relationship with Discover would struggle to maintain a claim.

## 2. Plaintiffs' State Law Claims Would Not Succeed.

Plaintiffs' claims under various states' consumer protection laws also lack merit and would not succeed if the litigation were to go forward. As with their RICO claims, Plaintiffs' inability to link Discover's purportedly wrongful conduct with any direct injury to themselves means they cannot show proximate causation—an element of all of the state consumer laws raised by Plaintiffs. *See Lorenzo v. Qualcomm Inc.,* 2009 WL 2448375, at *6 (S.D. Cal. Aug. 10, 2009) (California's UCL requires proximate cause); *Muir v. Playtex Prod.*, LLC, 983 F.Supp.2d 980, 987 (N.D. Ill. 2013) (Illinois's Consumer Fraud and Deceptive Business Practices Act requires a showing of proximate cause).

There are other reasons why these claims are defective. Plaintiffs brought claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, even though none are Illinois businesses. *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E. 2d 801, 855 (Ill. 2005) (no claim possible where "the only connection with Illinois is the headquarters of the defendant or the fact that a scheme 'emanated' from Illinois"). And as businesses, plaintiffs do not constitute consumers protected by the consumer protection laws of New Jersey, New York, or Pennsylvania. *See J&R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994) (New Jersey); *Exxonmobil Inter-America, Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 448 (S.D.N.Y. 2004) (New York); 73 Pa. Stat. § 201-9.2(a) (Pennsylvania).

The same is true as to Plaintiffs' common-law claims. Plaintiffs cannot establish breach of contract because Discover did not enter into any contract with Plaintiffs that set forth which fees would be charged. Likewise, Plaintiffs' unjust enrichment claims fail because they did not directly confer a benefit on Discover.

## II. THE SETTLEMENT PROVIDES AN APPROPRIATE VEHICLE TO PROVIDE RESTITUTION TO AFFECTED ENTITIES.

The Settlement presents an efficient and effective process to make whole those entities affected by the misclassification. It includes a restitution methodology designed to refund all estimated overcharges and provide interest. This methodology has been vetted by Plaintiffs and their experts and was finalized after the parties' mediation sessions; during confirmatory discovery in connection with this Settlement, Discover produced to Plaintiffs' counsel the full code used to calculation restitution.

The restitution methodology estimates the amount of overcharges that have been incurred by each merchant identifier account from 2007 to 2023. To determine what card accounts were misclassified, in 2023, Discover Bank undertook a comprehensive months-long analysis of all active accounts in good standing as of 2022 and reclassified those accounts to ensure they were properly classified on a going forward basis. Based on this analysis, Discover Bank concluded that millions of transactions that had previously been classified as having been made by "commercial" card accounts should instead be classified into one of three tiers of "consumer" card accounts.[4] For purposes of calculating restitution, the restitution methodology assumes that cards were misclassified at similar rates throughout the entire class period. *See* Settlement, Ex. B § 2.1–2.3.

Applying this assumption, the methodology then compares on an annual basis the interchange fees Discover actually charged to each merchant identifier account in connection with each misclassified transaction to the fees Discover estimates would have been charged in the but-

---

[4] Specifically, Discover determined that 37.846% of the misclassified commercial card volume should have been appropriately classified in the consumer "Premium Plus" tier, 43.437% of that should have been classified in the consumer "Premium" tier, and the remaining 18.717% of that volume should have been classified in the consumer "Rewards" tier.

for world where transactions were properly classified. For the period from 2016-2023, Discover has actual transaction-level data to perform this calculation. *See id.* § 2.1. Discover does not have similar transaction-level data prior to 2016. Instead, for that period, Discover determined that the best starting point for estimating the total sales processed by each merchant identifier account during this period is to assume that each account's actual sales each year were a percentage of the account's actual sales in 2016.[5] *See id.* § 2.2. Based on that estimate, Discover then applies the same calculation it used to determine the amount of overcharges from 2016-2023 to estimate the amount of overcharges from 2007-2015.[6] *See id.* §§ 2.2–2.3. The restitution methodology then calculates, and adds to the restitution payment, an interest payment from the year over the overcharge through the date of preliminary approval. *See id.* § 2.4.

This restitution formula is more beneficial to class members than the restitution they could have obtained via litigation in at least two respects. *First*, if this case proceeded, any restitution calculation would be entitled to account for the net impact of the misclassification issue. In other words, a litigation-driven restitution figure would have had to account for the fact that certain consumer cards were classified in a lower tier than they otherwise could have been, and merchant identifier accounts that processed these transactions would have been charged a *lower* interchange fee than they would have been if the cards were classified differently. The restitution methodology ignores these situations and instead compensates class members based on the gross amount of excessive interchange fees. As a result, class members are in a better position than they otherwise would have been. *Second*, under the settlement, many class members stand to receive minimum

---

[5] This fraction varies by year, and it corresponds to the ratio of Discover's overall sales volume in a particular year to Discover's overall sales volume in 2016. Settlement, Ex. B, § 1.17.

[6] The methodology makes a further adjustment to account for the fact that between 2007-2010, Discover did not offer a consumer "Premium Plus" tier, and therefore Discover assumes that all sales which would have otherwise been classified into that tier during this time period were instead classified into the consumer "Premium" tier. *Id.* § 2.3.

payments that exceed the overcharges they paid.

Although the restitution methodology determines the amount of restitution associated with each merchant identifier account, it does not determine *which* of the various entities associated with that merchant identifier account—which could be an acquirer, a payment intermediary, or one or more merchants—are entitled to receive the restitution payment. As a result, the Settlement Agreement combines a robust notice program with a comprehensive claims administration process. Settlement §§ 3.3, 5.4. The settlement administrator is tasked with analyzing information provided by Discover and class members and allocating restitution payments among class members. *Id.* § 4.1. Class members eligible for payments will be notified about the amount they are allocated through the process and will have the right to submit additional information to the settlement administrator. *Id.* §§ 5.7–5.9.

The Settlement Class could not have achieved this result through litigation—and certainly not as quickly as they have via this settlement. The parties' Settlement recognizes that litigation is not always the best way to provide restitution to affected entities, and reflects months of the parties working constructively to design a fair process to distribute that restitution to class members.

## CONCLUSION

For these additional reasons, this Court should enter the Preliminary Approval Order.

Dated: August 27, 2024                  Respectfully submitted,

By:   _/s/ Andrew Soukup_

Valerie L. Hletko
Andrew Soukup
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW Washington, DC 20001-4956
Tel.: (202) 662-6000
Email: vhletko@cov.com
Email: asoukup@cov.com

Julie B. Porter (#6243787)
SALVATORE PRESCOTT PORTER & PORTER, PLLC
1010 Davis Street
Evanston, IL 60201
(312) 283-5711
porter@spplaw.com

*Counsel for Defendants Discover Financial Services, DFS Services LLC, and Discover Bank*