**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CAPP, INC., YOUNG PEOPLES DAY CAMPS INC., KMJA DAY CAMPS, INC., AND PRAYUS GROUP LLC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, AND DISCOVER BANK,<br><br>Defendants. | Case No. 1:23-cv-04676 |
| LEMMO'S PIZZERIA, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, DISCOVER BANK, AND DOES 1–100,<br><br>Defendants. | Case No. 1:23-cv-14250 |
| SUPPORT ANIMAL HOLDINGS, LLC, and LENNYS CASITA, LLC, individually, and on behalf of all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, DISCOVER BANK, AND DOES 1–100,<br><br>Defendants. | Case No. 1:23-cv-15297 |

**PLAINTIFFS' MOTION AND MEMORANDUM FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

I.      Interchange Fees and the Entities Involved in Credit Card Processing ............................ 3

II.     Relevant History ........................................................................................................ 6

III.    Summary of the Settlement Agreement ....................................................................... 8

        A.      The Settlement Class ................................................................................. 8

        B.      Monetary Relief ........................................................................................ 9

                1.      Calculation of the MID Amounts for Each MID ..................................... 10

                2.      Notice and Claims Process ................................................................. 10

                3.      Allocation of MID Amounts Among Claimants ...................................... 12

                4.      Calculation of Settlement Payments ................................................... 13

                5.      Notice of Total Allocated MID Amounts .............................................. 15

                6.      Funding of the Settlement Escrow Account .......................................... 15

                7.      Residual Settlement Payment Funds ................................................... 16

        C.      Release .................................................................................................. 16

        D.      Opt-Out and Objection Procedures ........................................................... 16

        E.      Attorneys' Fees, Expenses, and Service Awards; Administrative Costs .............. 17

IV.     The Notice Program and Claim Process Are Being Implemented as Directed by
        the Court ................................................................................................................. 17

V.      The Reaction of the Settlement Class to Date Has Been Very Positive. ......................... 19

ARGUMENT .................................................................................................................. 20

I.      The Court Should Grant Final Approval of the Settlement. ............................................ 20

        A.      Plaintiffs and Settlement Class Counsel Have and Continue to Zealously
                Represent the Settlement Class (Rule 23(e)(2)(A); *Wong* Factor 6). ................. 21

        B.      The Settlement Is the Product of Arm's-Length Negotiations (Rule
                23(e)(2)(B)). ............................................................................................ 22

        C.      The Settlement Represents a Strong Result for the Settlement Class,
                Particularly Given the Risks and Likely Duration of Ongoing Litigation
                (Rule 23(e)(2)(C)(i); *Wong Factors* 1 and 2). ............................................. 23

                1.      The Costs, Risks, and Delay of Trial and Appeal (Rule
                        23(e)(2)(C)(i); *Wong* Factor 2). ...................................................... 25

**TABLE OF CONTENTS**
(continued)

Page

2.    The Method of Distributing Relief Is Effective (Rule 23(e)(2)(C)(ii)). .................................................................. 26

3.    The Terms of Any Proposed Award of Attorney's Fees (Rule 23(e)(2)(C)(iii)). ................................................................. 27

4.    There Are No Additional Agreements to Disclose (Rule 23(e)(2)(C)(iv)). ................................................................. 27

5.    The Settlement Treats Settlement Class Members Equitably (Rule 23(e)(2)(D)). ................................................................. 28

6.    The Settlement Class's Response to Date and the Opinion of Competent Counsel Also Support Final Approval (*Wong* Factors 3, 4, and 5). ................................................................. 28

II.    The Court Should Re-Affirm Certification of the Settlement Class. ............................... 29

CONCLUSION .................................................................................................................. 29

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Gehrich v. Chase Bank USA, N.A.*,
316 F.R.D. 215 (N.D. Ill. 2016) .................................................................................24

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
789 F. Supp. 2d 935 (N.D. Ill. 2011) ........................................................................22

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
270 F.R.D. 330 (N.D. Ill. 2010) .................................................................................26

*In re Capital One Tel. Consumer Prot. Act. Litig.*,
80 F. Supp. 781 (N.D. Ill. 2015) ...............................................................................24

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*,
332 F.R.D. 202 (N.D. Ill. 2019) .................................................................................23

*In re TikTok, Inc., Consumer Privacy Litig.*,
617 F. Supp. 3d 904 (N.D. Ill. 2022) ..............................................21, 23, 24, 29

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
877 F.3d 276 (7th Cir. 2017) .....................................................................................24

*Lechuga v. Elite Eng'g, Inc.*,
559 F. Supp. 3d 736 (N.D. Ill. 2021) ........................................................................20

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ........................................................................24

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) .....................................................................................23

*T.K. Through Leshore v. Bytedance Tech. Co.*,
No. 19-cv-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022) ....................22, 23, 28

*Wong v. Accretive Health, Inc.*,
773 F.3d 859 (7th Cir. 2014) ...........................................................21, 24, 25, 28

**Statutes**

18 U.S.C. § 1962(c)-(d) ........................................................................................................7

**Court Rules**

Fed. R. Civ. P. 23(a) ..........................................................................................................29

**TABLE OF AUTHORITIES**
(continued)

**Page**

Fed. R. Civ. P. 23(b) ................................................................................................29

Fed. R. Civ. P. 23(e) ........................................................................................ *passim*

Fed. R. Civ. P. 23(h) ................................................................................................27

## <u>INTRODUCTION</u>

After nearly two years of vigorous investigation, advocacy, and hard-fought negotiations, the parties reached a Settlement that would resolve claims that Discover assessed inflated interchange fees on misclassified credit card transactions between 2007 and 2023.[1]  Pursuant to the Settlement, eligible businesses will receive payments calculated based on 100 percent of their estimated alleged fee overcharges incurred during the relevant time period, plus interest.  In all, Discover will pay a minimum of $540 million, and as much as $1.225 billion plus additional interest, to affected entities.  Following preliminary approval of the Settlement, and with implementation of the Court-approved Notice Program now well underway, Plaintiffs respectfully request that the Court grant final approval of the Settlement as fair, reasonable, and adequate.

The Settlement represents a very strong result for the Settlement Class.  Leveraging the data provided by Discover, Merchant Acquirers, and Payment Intermediaries, it will provide eligible businesses refunds based on 100 percent of their estimated damages, plus interest through the Escrow Final Funding Date—a rare outcome for a class action.  The Settlement includes notice, claims, and allocation processes that are thoughtfully designed to reach the affected entities, maximize participation, calculate settlement payment amounts, and ensure that payments go to the entities that incurred the alleged overcharges.

---

[1] Unless otherwise defined, capitalized terms appearing in this motion are defined as provided for in the Class Action Settlement Agreement and Release, *see CAPP*, ECF No. 65-1 (the "Settlement Agreement" or "Settlement").

The Court-approved robust Notice Program is now underway, and includes direct mail, email, and reminder notices, a comprehensive media and digital notice campaign, a settlement website, and an informational toll-free hotline. *See generally* Joint Decl., Ex. 1 ("Azari Decl.").[2]

The Settlement here represents a particularly strong result given the significant risks and uncertainty Plaintiffs and the Settlement Class faced had the litigation continued, including with respect to arbitration, liability, and damages issues. From the outset, Discover sought discovery regarding a potential motion to compel arbitration, which would have created risks and, at the least, delayed the litigation. Plaintiffs also would have faced a vigorous defense, including Discover's challenge to the premise that it had a legal obligation to Settlement Class Members in implementing its internal classification system.

The Settlement is the culmination of a lengthy, adversarial negotiation process, mediated by the Honorable Jay Gandhi (Ret.) of JAMS, including three in-person mediation sessions, numerous follow-up conferences, and extensive negotiations finalizing the written Settlement agreement, allocation Methodology, notice and claims process, notice and claim forms, and other settlement documents. Moreover, while the Settlement occurred at an early stage of the litigation procedurally, it is well informed by Plaintiffs' extensive investigation and confirmatory discovery efforts, which included the analysis of Discover's transactional data and documentation, formal interviews with pertinent Discover employees and data analysts, and work with several subject matter experts. Moreover, after Discover identified additional data for the early part of the class period, Plaintiffs persisted in negotiating modifications to the Settlement that resulted in substantial additional benefits for the Settlement Class.

---

[2] Plaintiffs and the Settlement Administrator will further update the Court, in advance of the Fairness Hearing, regarding the implementation of the Notice Program.

This Settlement satisfies all criteria for final approval. Plaintiffs thus respectfully request that the Court grant final approval of the Settlement as fair, reasonable, and adequate, and re-affirm certification of the Settlement Class.

## BACKGROUND

I. **Interchange Fees and the Entities Involved in Credit Card Processing**

For every Discover credit card transaction, Discover assesses an "interchange fee," a portion of the payment that is calculated as a percentage of the transaction amount (called an "interchange rate"). The interchange rate for a given transaction depends on multiple factors, including the type of Discover card account used. *See CAPP*, ECF No. 59-3 ("Levitin Decl.") ¶¶ 33–35. Two categories of Discover accounts that existed during the relevant time period were "Consumer" accounts and "Commercial" accounts. As alleged, the interchange rates applicable to Commercial account transactions were generally higher than for Consumer card accounts. Consumer accounts, in turn, were further divided into "Core," "Rewards," "Premium," and (for some of the relevant time period) "Premium Plus" accounts, each with different corresponding interchange rates. In addition to a variable rate fee applied on the transaction amount, Discover also typically collected a flat per-transaction "network fee" (e.g., $0.05 per transaction) that varied based on the Discover card account type. *Id.* ¶¶ 33, 36.

At least five persons or entities are involved in a typical Discover credit card transaction: (i) the ***cardholder***, who makes a payment for a purchase using a credit card; (ii) the cardholder's ***issuing bank*** (here, Discover Bank), which issues the credit card and maintains the cardholder relationship; (iii) the ***payment network*** (here, DFS Services, LLC), which facilitates the credit card transaction by communicating financial information between the cardholder's issuing bank and the merchant acquirer; (iv) the ***Merchant Acquirer*** (also known as a "merchant bank," an "acquiring bank," or an "acquirer"), which contracts with the merchant to maintain the merchant

relationship, receive payments from the issuing bank, and pay the merchant; and (v) the ***End Merchant***, which agrees to accept payment by credit card from the cardholder.  Levitin Decl. ¶¶ 27–32.  In addition, one or more Payment Intermediaries (discussed below) are involved in many Discover credit card transactions.  *Id*. ¶¶ 46–53.

When a Discover cardholder makes a purchase and pays a merchant using her Discover credit card, the merchant electronically transmits a request to the issuing bank (through the Merchant Acquirer/Payment Intermediary).  The issuing bank verifies the information and, if funds are available, authorizes payment less any "interchange fee" and "network fee" that are retained by Discover (the payment network).  The most typical Discover card transaction cycle is illustrated below:



1. Cardmember makes purchase at Merchant accepting Discover

**Direct Merchant**
2. Merchant submits transaction to Discover
3. Discover reimburses Merchant for amount of transaction less fees (skip to step 8)

**Indirect Merchant**
4. Merchant submits transaction to Acquirer
5. Acquirer reimburses Merchant for amount of transaction less discount fee
6. Acquirer submits transaction to Discover
7. Discover reimburses Acquirer for amount of transaction less acquirer interchange fee
8. Discover bills Cardmember for amount of transaction
9. Cardmember makes payment to Discover

*This is a simplified illustration of a typical credit card transaction. It does not reflect certain operations and assessment fees, cash or balance transfer transactions, authorizations, disputes or other specifics.

In this typical scenario, where the End Merchant processes transactions via a Merchant Acquirer, the Merchant Acquirer is credited with payment from the issuer (the transaction amount minus the interchange fee and network fee), and the Merchant Acquirer will then credit the End

Merchant's account with the amount of the transaction minus a fee it has negotiated with the End Merchant (called the "discount fee"). Levitin Decl. ¶ 37.

Under this structure, identifying which entity directly incurs Discover's interchange fees—and thus would incur any interchange fee *overcharges* (the alleged damages in this case)—depends on the terms of the business relationship between the End Merchant and the Merchant Acquirer regarding how the discount fee is calculated. There are three common discount fee pricing structures: (1) a "flat rate" structure, where the End Merchant pays the Merchant Acquirer a fixed per-transaction discount fee; (2) a "cost-plus" structure, where the End Merchant pays the Merchant Acquirer a discount fee calculated based on the interchange fee plus the network fee and plus a markup; and (3) a "tiered" structure where the End Merchant pays the Merchant Acquirer different fixed rates depending on certain "qualification" criteria. For the second of these structures (i.e., cost-plus), the interchange fee is directly passed on by the Merchant Acquirer to the End Merchant. For the other two structures, the discount fee paid by the End Merchant is independent of the amount of the interchange fee assessed on the transaction. Levitin Decl. ¶¶ 37–43.

Not all Discover credit card transactions are limited to the above participants. For many transactions, a Payment Intermediary is involved as well. For example, sometimes one merchant (e.g., a franchisor) will serve as the merchant of record for a collection of other affiliated merchants (e.g., franchisees). In those instances, the Merchant Acquirer will settle transaction funds into the account of the merchant of record, which will then remit the funds to its franchisees or dealers according to their own individually negotiated economic terms. In another example, some End Merchants operate through a "marketplace" platform (e.g., AirBnb, Amazon, DoorDash, eBay, MindBody, Shopify, or Uber), where that platform serves as the merchant of

record and will have the relationship with the Merchant Acquirer.  The marketplace platform, in turn, will have its own economic relationship with the End Merchant.  In another example, some End Merchants use payment processors (e.g., Square, Stripe, PayPal) to handle their payments card transactions.  These processors are not Merchant Acquirers themselves, but instead partner with a Merchant Acquirer (sometimes an affiliate) to accept payments on behalf of the End Merchant.  In each of these examples, the economic terms between Payment Intermediaries and the downstream End Merchants they serve will vary, and may or may not include an express pass-through of the interchange fee.  Levitin Decl. ¶¶ 46–53.

Finally, a relatively small number of "Direct End Merchants"—typically merchants with large Discover card sales volumes—have direct contractual relationships with Discover, pursuant to which Discover in essence serves the role of Merchant Acquirer (in addition to serving as the payment network).

Thus, whether an interchange fee overcharge on a given transaction (the alleged damages in this case) was borne by the End Merchant and/or by another entity or entities will vary.  Other than for certain entities that have direct processing relationships with Discover, Discover's data does not reflect how the interchange fees are allocated, if at all, among the different possible entities involved.  Levitin Decl. ¶¶ 44, 54.

## II.   <u>Relevant History</u>

Beginning in or around April 2023, Plaintiffs' counsel separately started investigating the possible misclassification of Discover credit card accounts.  Joint Decl. ¶ 6.  On July 19, 2023, the *CAPP* plaintiffs filed the first class action related to this issue, alleging that Discover misclassified credit card accounts and that the interchange fees Discover assessed on some transactions were higher than such fees would have been had the accounts been correctly classified: *CAPP, Inc. v. Discover Financial Services*, No. 1:23-cv-04676 (N.D. Ill.) ("*CAPP*").

*Id.* ¶ 8. That same day, Discover disclosed that from 2007 through 2023, it had systematically misclassified certain "Consumer" credit card accounts as "Commercial" accounts.[3] Two additional class action lawsuits were filed on August 14, 2023 and August 29, 2023, respectively: *Lemmo's Pizzeria, LLC v. Discover Financial Services*, No. 1:23-cv-14250 ("*Lemmo's*") and *Support Animal Holdings, LLC v. Discover Financial Services*, No. 1:23-cv-15297 ("*Support Animal*"). The *Lemmo's* and *Support Animal* actions were originally filed in the Central District of California and subsequently transferred to this District (where the *CAPP* action was filed) and assigned to this Court. *See Lemmo's*, ECF Nos. 1, 21; *Support Animal*, ECF Nos. 1, 14. Collectively, the lawsuits allege claims under the federal Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(c)–(d), and under state consumer protection statutes and common law. On January 8, 2024, the *Lemmo's* and *Support Animal* cases were deemed related to the *CAPP* case and assigned to this Court. *See CAPP*, ECF No. 36.

In early 2024, after *CAPP* and *Lemmo's* counsel agreed to coordinate their efforts, the parties agreed to explore a potential resolution of these cases, and the Court granted the parties' joint motions to stay the litigation pending mediation. *See, e.g.*, *CAPP*, ECF No. 42. Over the next several months, the parties engaged in extensive, arm's-length settlement negotiations, including three full-day in-person mediation sessions with the Hon. Jay C. Gandhi (Ret.) of JAMS, and numerous follow-up conferences and discussions through Judge Gandhi.

In addition, while the parties were engaged in settlement negotiations, they simultaneously engaged in discovery for purposes of mediation, exchanging information throughout the mediation process. Through these efforts, and with the ongoing assistance of

---

[3] *See* Discover Financial Services Form 8-K, Ex. 99.1, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1393612/000139361223000037/dfs-20230719.htm (last accessed Dec. 1, 2025).

Judge Gandhi, the parties were able to reach an agreement in principle and thereafter worked extensively on drafting a written settlement agreement (i.e., the original settlement), including a payment calculation Methodology, notice program, numerous notice and claim forms and other settlement exhibits. Moreover, Settlement Class Counsel conducted extensive confirmatory discovery, including the analysis of Discover's transactional data and documentation, formal interviews with pertinent Discover employees and data analysts, an on-site visit to Discover's headquarters, and work with several subject matter experts. Joint Decl. ¶¶ 36–39. The original settlement was presented to the Court on August 27, 2024. *See CAPP*, ECF Nos. 59, 60; Joint Decl. ¶ 42. The Court granted preliminary approval of the original settlement on October 22, 2024. *See CAPP*, ECF No. 63.

After the Court preliminarily approved the original settlement, Discover disclosed that it had identified new entity-level transactional data (in the possession of Discover Bank) that would support a more accurate calculation of MID Amounts for the years 2007 through 2015. Joint Decl. ¶ 45. The parties thereafter commenced negotiations about this newly discovered data and how it could impact (and improve) the notice program, the calculation of Settlement Payments, and claims administration. Following weeks of arm's-length negotiations and additional confirmatory discovery, on January 21, 2025, the parties executed a modified Settlement Agreement, which accounted for the newly discovered data and included multiple enhancements benefitting of the Settlement Class. *See CAPP*, ECF Nos. 65-1, 65 (describing improvements); Joint Decl. ¶¶ 47–54. The Court preliminarily approved the modified Settlement on July 30, 2025. *CAPP*, ECF No. 68 ("PAO" or "Preliminary Approval Order").

III.   **Summary of the Settlement Agreement**

    A.   **The Settlement Class**

The Court has certified the following Settlement Class, for settlement purposes:

> All End Merchants, Merchant Acquirers, and Payment Intermediaries involved in processing or accepting a Misclassified Card Transaction during the Relevant Period [January 1, 2007 through December 31, 2023], except the entities and individuals listed on Exhibit A to the Agreement.

PAO ¶ 4.[4]  As reflected in the definition, broadly speaking, Settlement Class Members fall into three categories: (1) "End Merchants" that "accepted a Discover Bank-issued credit card directly from a person as payment in return for the delivery of goods or services" (Settlement § 2.20); (2) "Merchant Acquirers" that "had an agreement with Discover to facilitate" credit card transactions (and were characterized by Discover's rules and regulations as "Acquirers") (Settlement § 2.30); and (3) "Payment Intermediaries" that processed credit card transactions on behalf of End Merchants or others, but that are neither Merchant Acquirers nor End Merchants (Settlement § 2.52).

## B.  <u>Monetary Relief</u>

Under the Settlement, Discover must pay eligible entities involved in processing or accepting a Misclassified Card Transaction during the Relevant Period—January 1, 2007 through December 31, 2023—refunds based on ***100 percent of the estimated fee overcharges they incurred, plus interest through the Escrow Final Funding Date.***  In the aggregate, Discover is obligated to pay up to approximately $1.225 billion plus additional interest, and in any event no less than $540 million, to affected businesses.  As summarized below, the Settlement relies on transactional data in Discover's possession and a carefully crafted notice and claims program to ensure that Settlement Payments are properly calculated and directed to the entities that bore the alleged fee overcharges.

---

[4] The excluded entities listed in Exhibit A to the Settlement are entities that agreed to individual settlements about this issue with Discover during the time between the filing of *CAPP* action and the modified Settlement.

### 1. Calculation of the MID Amounts for Each MID

Discover calculated the total estimated interchange fee overcharge (called the "MID Amount") for each "MID" (i.e., the "merchant identification number" attributed to an End Merchant) that had an identified misclassified card transaction from 2007 to 2023, using Discover's best available data and pursuant to a detailed formula (called the "Methodology"). *See* Settlement, Ex. B (Methodology). The Methodology estimates for each affected MID the difference between (i) the interchange fees Discover assessed on Misclassified Card Transactions, and (ii) what it would have assessed on those transactions had the credit cards at issue been correctly classified. Specifically, an "Annual MID Amount" is calculated for each such MID for each year, pursuant to the steps set forth in the Methodology. Those Annual MID Amounts are added up, and then interest is added to the total (Settlement, Ex. B §§ 1.13, 2.1–2.4) to arrive at the total MID Amount for each MID.

Following Discover's discovery of additional pre-2016 transactional data, the Methodology was updated to utilize the additional data. *See CAPP*, ECF No. 65 at 6 (explaining modifications). The vast majority of MID Amounts calculated using the additional data and updated Methodology are higher than under the original data and methodology. For those MIDs where that was not the case, the Settlement includes a provision whereby the MID Amounts for those MIDs will be calculated using the original methodology. Settlement, Ex. B § 2.4. This provision ensures that no Payment Eligible Settlement Class Member will receive less than what it was entitled to receive under the original settlement.

### 2. Notice and Claims Process

As detailed in Plaintiffs' preliminary approval papers, the Settlement includes a thoughtfully designed notice and claims process to account for certain limitations in Discover's data (including that Discover in most cases does not know which entity bore the interchange

- 10 -

fees), and to ensure that Settlement Payments are properly calculated and directed to the entities that bore the alleged fee overcharges. Following the Court's Preliminary Approval Order, the notice process and corresponding gathering of information has commenced, and is being implemented by the Settlement Administrator in stages. *See* Azari Decl. ¶¶ 8, 11–12, 45. The process is designed to ensure that the Settlement Administrator receives the information it needs to reasonably allocate and calculate payments, while minimizing the burden on each claimant to the extent reasonably possible. *See CAPP*, ECF No. 59 at 11–16 (detailing process); *CAPP*, ECF No. 65 at 8–9 (describing updates in the modified Settlement).

The steps and information that Settlement Class Members are required to provide will vary somewhat depending on the type of entity they are:

- ***Indirect End Merchants***. These are End Merchants that processed Discover cards through a third party (e.g., through a Merchant Acquirer or Payment Intermediary) and not through a direct relationship with Discover. Most Settlement Class Members are in this category. These entities are required to submit a claim to receive a payment. Settlement § 3.3.4. These entities will need to submit a claim because Discover lacks information for these MIDs about which entity or entities bore the overcharges at issue and does not know which entity to pay. Levitin Decl. ¶¶ 43–44, 61–64, 66(d).

- ***Unmanaged Active Direct End Merchants***. These are entities with direct processing arrangements with Discover and that currently or recently accepted Discover cards, but which do not have dedicated relationship managers. They will be automatically deemed Payment Eligible and will be mailed a Settlement Payment without the need to file a claim. Settlement §§ 3.3.1, 3.3.3; Levitin Decl. ¶¶ 64, 66(b).

- ***Managed Active Direct End Merchants.*** These are the same as the prior group, except that they interact with Discover through a dedicated client relationship manager. Settlement § 2.28. There are 392 entities in this category. They will be automatically deemed Payment Eligible. However, to receive payments they must provide information about where to send the payment and confirm that they are the correct entity to receive the payment (i.e., because Discover does not know whether these entities passed on the fees to another downstream entity that Discover does not have a direct relationship with). The Settlement Administrator will make multiple efforts, in advance of the Settlement Claim Deadline, to reach out to these entities to obtain such information. Settlement §§ 3.3.2–3.3.3; Levitin Decl. ¶¶ 62, 64, 66(a).

- ***Inactive Direct End Merchants.*** These are End Merchants that once had direct processing relationships with Discover but either no longer have a direct processing relationship with Discover or have not accepted a Discover card recently. These entities will be required to submit a claim to receive a payment, because Discover lacks information for these MIDs about which entity or entities bore the overcharges at issue and thus does not know which entity to pay. Settlement § 3.3.4; Levitin Decl. ¶¶ 62, 64, 66(c).

- ***Payment Intermediaries*** and ***Merchant Acquirers***. These entities each must take two steps to receive a settlement payment. First, they must file a timely claim. Second, they must provide additional information ("Payment Intermediary Information" and "Merchant Acquirer Information," respectively) identifying the Downstream Entities for the MIDs they are associated with and, for each such MID, the corresponding pricing arrangements/which entities bore the interchange fees.[5] Again, the primary reason that is necessary is that Discover lacks information, for these MIDs, about which entities bore the overcharges at issue. Settlement §§ 2.31, 2.53, 3.3.5–3.3.6; Levitin Decl. ¶¶ 44, 54, 63, 66(e) & (f).

### 3. Allocation of MID Amounts Among Claimants

For each MID where there is one or more MID Claimants (i.e., one or more entities that submitted a timely and valid claim), the Settlement Administrator will determine the Allocated MID Amount attributable to each MID Claimant for that MID. Broadly speaking, the Settlement Administrator's task will be to determine the extent, if any, that each such MID Claimant bore the interchange fee overcharges associated with that MID. In doing so, the Settlement Administrator will consider all information made available to it, including by claimants in their claim forms and otherwise, Merchant Acquirer Information and Payment Intermediary Information submitted to or otherwise obtained by the Settlement Administrator, and information provided by Discover regarding payments made or proposed by Discover outside of the settlement to resolve the issues asserted in this litigation (e.g., to certain excluded entities and

---

[5] To the extent a Merchant Acquirer or Payment Intermediary does not timely provide the required information, the Settlement Administrator will take additional steps to try to obtain such information through commercially reasonable means (since that information will assist with supplemental direct notice and with calculating and allocating settlement payments). Settlement § 3.3.7.

opt-outs), and any other pertinent information the Settlement Administrator is provided. The Settlement provides guidelines for the Settlement Administrator for this process. Settlement § 3.4. If the Settlement Administrator cannot independently calculate the Allocated MID Amount for any MID, the Settlement Administrator will consult with Discover and Settlement Class Counsel regarding how to properly allocate the MID Amount among all MID Claimants for that MID. Settlement § 3.4.4.

### 4. Calculation of Settlement Payments

Pursuant to Sections 3.5.2 and 3.5.3 of the Settlement, the Settlement Payment amount for each Payment Eligible Settlement Class Member will be calculated by the Settlement Administrator as 100 percent of that Payment Eligible Settlement Class Member's Total Allocated MID Amount—i.e., the total of all of their Allocated MID Amounts for all MIDs associated with that Payment Eligible Settlement Class Member,[6] subject to the following potential adjustments:

***Settlement Base Payments***. If a Payment Eligible Settlement Class Member's total Settlement Payment (for any and all associated MIDs) would otherwise be less than $10.00, that Settlement Class Member will receive a Settlement Base Payment, so that the Settlement Class Member's total Settlement Payment will equal $10.00,[7] provided that the total amount of all Settlement Base Payments Discover is obligated to pay does not exceed $50 million (the "Settlement Base Payment Maximum"). Settlement § 3.5.4. If the total amount of all Settlement Base Payments Discover is obligated to pay exceeds $50 million, the amount of each Settlement

---

[6] Settlement Class Members may be associated with more than one MID. Settlement Payments will include any Allocated MID Amounts the Settlement Class Member is entitled to.

[7] For clarity, Settlement Class Members who submit valid claims and for whom the Settlement Administrator calculates $0.00 Allocated MID Amounts will be entitled to the Settlement Base Payment.

Base Payment will be reduced on a pro rata basis until the total amount of Settlement Base

Payments reaches the Settlement Base Payment Maximum. *Id*. § 3.5.4.3.

    ***Minimum Total Class Payout***.  Under the terms of the Settlement, Discover has agreed

to pay affected entities a total of no less than $540 million (the "Minimum Total Class Payout").

Specifically, if the total of all Settlement Payments due to all Payment Eligible Settlement Class

Members, together with the Adjusted Total Non-Claimant Payment,[8] does not exceed $540

million, then each Payment Eligible Settlement Class Member's Settlement Payment will be

increased on a pro rata basis until the total of such payments reaches the Minimum Total Class

Payout (i.e., $540 million).  Settlement § 3.5.5.

    ***Total Settlement Payout***.  Separately, the Settlement limits the total amount Discover

must pay to affected entities by imposing a ceiling on payments to all affected entities.

Specifically, the Settlement defines the "Total Settlement Payout" as the sum of: (a)

$1,225,311,279 (which is the total of all MID Amounts calculated under the Methodology plus

interest through the end of 2024); plus (b) the additional interest in 2025 and beyond, through the

date of the Escrow Final Funding Date.  Settlement § 2.79.  If the total of all Settlement

Payments due to all Payment Eligible Settlement Class Members, together with the Adjusted

Total Non-Claimant Payment,[9] exceeds the Total Settlement Payout figure, then each Payment

---

[8] Since the commencement of these lawsuits, Discover has engaged and continues to engage in discussions with certain Settlement Class Members (or entities that would otherwise meet the definition of Settlement Class Members) to resolve the claims raised by these lawsuits on an individual basis.  Certain payments made or agreed to by Discover to resolve such claims (defined as "Non-Claimant Payments" in the Settlement), up to the Total Allocated MID Amounts for those entities (but including interest only through the date of the Preliminary Approval Order, i.e., July 30, 2025), will be considered in determining whether Settlement Payments are to be adjusted to ensure that Discover's total payments to affected entities meet the minimum threshold (i.e., the Minimum Total Class Payout) and do not exceed the maximum limit (i.e., the Total Settlement Payout).  Settlement §§ 2.2, 3.5.1.

[9] *See supra* note 8.

Eligible Settlement Class Member's Settlement Payment would be reduced on a pro rata basis until the total of such payments reaches the Total Settlement Payout figure.  Settlement § 3.5.6.

### 5.     __Notice of Total Allocated MID Amounts__

Prior to finalizing the calculation of Settlement Payments and sending payments, the Settlement Administrator will send each Payment Eligible Settlement Class Member notice of their Total Allocated MID Amount (and, if applicable, their estimated Base Payment Amount). The Settlement Class Member will then have 35 days to provide additional information for the Settlement Administrator's further consideration regarding allocations.  Settlement § 5.12.

Following final determinations regarding allocations, and within 240 days after the Effective Date (the "Payment Date"), Settlement Payments will be issued to Payment Eligible Settlement Class Members.  Settlement Payments will be made by mailed check or, at the Payment Eligible Settlement Class Member's election and provision of account information, electronic ACH.  Settlement checks will be valid for 120 days.  For mailed checks, additional efforts will be made to re-mail checks that are returned undeliverable.  Settlement § 5.13.

### 6.     __Funding of the Settlement Escrow Account__

The Settlement provides a schedule for Discover to fund the Settlement Escrow Account from which the Settlement Payments will be issued.  First, no later than 23 days after entry of the Final Approval Order, Discover will pay $100 million (the "First Funding Amount") into the Settlement Escrow Account.  Settlement § 5.11.  Second, no later than 10 days after the Effective Date, Discover will pay into the Settlement Escrow Account the difference between the First Funding Amount and a reasonable estimate of the aggregate total of all of Settlement Payments for all Payment Eligible Settlement Class Members, as determined by the Settlement Administrator with input from the Parties (the "Second Funding Amount").  *Id*.  Finally, within 235 days after the Effective Date (the "Escrow Final Funding Date"), Discover will fund any

additional amounts needed to make the Settlement Payments as finally calculated (or receive a refund of any overpayment as applicable). *Id.* Interest earned on the funds in the Settlement Escrow Account (other than interest earned on any portion, if any, that is refunded to Discover at the Escrow Final Funding Date), will be added on a pro rata basis to, and included in, the Settlement Payments issued. *Id.*

### 7. Residual Settlement Payment Funds

If there are any Settlement Payment amounts that remain in the Settlement Escrow Account 210 days after the Payment Date—consisting of Settlement Payment checks that were successfully delivered but not timely negotiated and Settlement Payments that the Settlement Administrator determines are undeliverable or that otherwise cannot be effectuated following reasonable efforts by the Settlement Administrator to contact and obtain from the Payment Eligible Settlement Class Member alternative payment information (collectively, "Residual Funds")—such Residual Funds will be distributed to a *cy pres* recipient to be proposed by Settlement Class Counsel with input from Discover, subject to Court approval. Settlement § 5.14.

### C. Release

In exchange for the relief provided by the Settlement, Settlement Class Members will release Discover and its affiliates for any claims about the issues in this case. Settlement §§ 2.57, 2.58, 3.7.

### D. Opt-Out and Objection Procedures

Any person or entity within the Settlement Class definition may request to be excluded from the Settlement Class by sending a signed request for exclusion to the Settlement Administrator postmarked by March 25, 2026 (the Opt-Out Deadline) that includes the information prescribed by the Settlement Agreement and detailed in the long-form notice. Any

Settlement Class Member that does not submit a timely and valid exclusion request may object to the Settlement, Settlement Class Counsel's application for attorneys' fees and expenses, and/or the request for service awards. To be considered, an objection must be in writing, must be filed with or mailed to the Court and mailed to the Settlement Administrator, must be filed/postmarked by the March 25, 2026 (the Objection Deadline), and must include the information prescribed by the Settlement Agreement and detailed in the long-form notice. Settlement §§ 5.7, 5.9; PAO ¶ 33.

### E. Attorneys' Fees, Expenses, and Service Awards; Administrative Costs

Concurrently with this Motion, Settlement Class Counsel are filing a motion requesting an award of $25 million in attorneys' fees plus reimbursement of $307,158.03 in litigation expenses, and requesting service awards of $7,500 each for the five Settlement Class Representatives. Any attorneys' fees, expenses, and service awards awarded by the Court will be paid separately by Discover on top of (i.e., in addition to) the Settlement Payments that are made to Payment Eligible Settlement Class Members. Settlement § 3.6.

Likewise, the fees and costs of the Settlement Administrator in implementing the Notice Program, obtaining information, processing and validating claims, determining allocations, sending Settlement Payments, and performing the other administrative tasks described in the Settlement, will be paid separately by Discover on top of (i.e., in addition to) the Settlement Payments that are made to Payment Eligible Settlement Class Members. Settlement §§ 2.44, 4.

### IV. The Notice Program and Claim Process Are Being Implemented as Directed by the Court.

As discussed in Plaintiffs' motions for preliminary approval, the Settlement includes a thoughtfully designed notice and claims process to account for certain limitations in Discover's data (including that Discover in most cases does not know which entity or entities bore the

- 17 -

interchange fees), and to ensure that Settlement Payments are properly calculated and directed to the appropriate recipients. This process is occurring over multiple stages. *See CAPP*, ECF No. 65-3 at Ex. B (Notice Plan); *CAPP* ECF No. 59 at 11–16 (summarizing notice and claims processes); *CAPP* ECF No. 65 at 8–9 (describing enhancements in the modified Settlement).

As detailed in the accompanying Azari Declaration, the notice and claim process has commenced and is being implemented as directed by the Court. Azari Decl. ¶ 23. Discover provided the Settlement Administrator with contact information and other data that Discover has regarding identified Settlement Class Members and potential Settlement Class Members. Settlement §§ 3.3.3.1, 3.3.3.2, 5.3.3; Azari Decl. ¶ 15. The Settlement Administrator sent direct *mail* notice to known Settlement Class Members and *email* notice to the extent email information was available. Azari Decl. ¶¶ 24–44. Multiple forms of direct notices are being utilized, corresponding to the different categories of Settlement Class Member entities, to inform recipients of the steps they must take and information they must provide in order to receive a Settlement Payment. *Id*. To date, the Settlement Administrator has sent more than 9.3 million mail notices and more than 8.3 million email notices. *Id*. ¶¶ 24, 40. These figures will increase as the Settlement Administrator continues to send out direct notices, including a second wave of direct notice and multiple rounds of reminder notices. *See id*. ¶ 45, 47.

The Settlement Administrator also has been receiving detailed Merchant Acquirer Information and Payment Intermediary Information, from those two groups respectively, which will be used to, *inter alia*, identify additional Settlement Class Members and contact information not identifiable in Discover's data, thus facilitating additional direct notices. Azari Decl. ¶¶ 28, 45.

Additionally, to supplement all of the direct notices, the Settlement includes, and the

Settlement Administrator has commenced, a robust media campaign, which will continue until the claim deadline of May 18, 2026. Azari Decl. ¶¶ 8, 12, 49–79. That campaign includes running the Court-approved Publication Notice in leading national business publications, consumer magazines, local business journal, specialty language publications, U.S. territory newspapers, an informational release, business association outreach; paid notices across major social media platforms; online display banner notices; and internet sponsored searches. *Id*. Banner notices, alone, are expected to generate approximately 360 million impressions. *Id.* ¶ 63. As of November 24, 2025, approximately 263.8 million such impressions have run. *Id.* ¶ 64. The Digital Notices running on the leading domestic social media platforms, alone, are expected to generate approximately 375 million impressions. *Id.* at ¶ 69. As of November 24, 2025, approximately 260 million such impressions have run. *Id*. Internet streaming radio spots, streaming TV, and podcast targeting are also being used to further supplement the print and digital notice methods. *Id*. ¶¶ 74–79.

Finally, the Settlement Administrator timely established the Settlement Website, www.DiscoverMerchantSettlement.com, which contains, *inter alia*, detailed information about the Settlement, answers to Frequently Asked Questions, a copy of the written Settlement Agreement and other pertinent court documents, contact information for Settlement Class Counsel, and an online claims portal that Settlement Class Members can use to submit claims and other information directly via the Settlement Website. Azari Decl. ¶ 82. Epiq also timely established a toll-free telephone number that provides live agent support to allow Settlement Class Members the ability to obtain additional information and support. *Id*. ¶ 83.

## V.    <u>The Reaction of the Settlement Class to Date Has Been Very Positive.</u>

With the notice process well underway, the reaction of the Settlement Class thus far has been very positive. The deadline for Settlement Class Members to opt-out or object is March 25,

2026.  PAO ¶ 33.  The Settlement Administrator reports that as of November 24, 2025, only 49

requests for exclusion have been submitted, and no objections have been submitted.  Azari Decl.

¶ 85.  Plaintiffs will update the Court regarding the number of opt-outs, objections, and claims,

in advance of the Fairness Hearing.

## ARGUMENT

### I.    The Court Should Grant Final Approval of the Settlement.

"Federal courts naturally favor the settlement of class action litigation, as settlement

minimizes the litigation expenses of both parties and also reduces the strain such litigation

imposes upon already scarce judicial resources."  *Lechuga v. Elite Eng'g, Inc.*, 559 F. Supp. 3d

736, 743–44 (N.D. Ill. 2021) (citations and quotations omitted).  Final approval is appropriate

where the court finds the proposed settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P.

23(e)(2).  To determine whether a settlement meets that standard, Federal Rule of Civil

Procedure 23(e)(2) directs courts to consider whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

   (i)    the costs, risks, and delay of trial and appeal;

   (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

   (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

   (iv)   any agreement required to be identified under Rule 23(e)(3); and

(D)   the proposal treats class members equitably relative to each other.

Moreover, courts in the Seventh Circuit look at the following factors, which overlap

significantly with, and can be analyzed in tandem with, the Rule 23(e)(2) factors: "(1) the

strength of the case for plaintiffs on the merits, balanced against the extent of [the] settlement

offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) [the] stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014); *In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d 904, 933, n.23 (N.D. Ill. 2022) (courts in this Circuit "appl[y] the factors as stated in *Wong*, with a focus on the core concerns expressed in [Rule 23(e)(2)]" (internal quotations omitted)).

In granting preliminary approval of the Settlement, the Court previously determined that it would likely be able to approve the Settlement. PAO ¶ 11. The relevant factors likewise support granting final approval of the Settlement.

**A.** **Plaintiffs and Settlement Class Counsel Have and Continue to Zealously Represent the Settlement Class (Rule 23(e)(2)(A); *Wong* Factor 6).**

As summarized in their Joint Declaration filed herewith, for more than two years Settlement Class Counsel have pursued this action on behalf of the Settlement Class with vigor and dedication. Fed. R. Civ. P. 23(e)(2)(A). Settlement Class Counsel thoroughly investigated the factual and legal issues involved; conducted substantial confirmatory discovery; retained and worked with multiple experts; undertook formal interviews with pertinent Discover employees and data analysts; vigorously represented the Settlement Class throughout the lengthy and complex settlement negotiations and drafting process (for the original settlement and modified Settlement); and negotiated a very strong Settlement for the Settlement Class, which includes notice, claims, and allocation processes that are thoughtfully designed to reach the affected entities and maximize participation, and ensure that payments are received by the entities that incurred the alleged overcharges. *See* Joint Decl. ¶¶ 6–7, 26–57.

Settlement Class Counsel were well informed throughout, developing a substantial "information base" upon which to effectively negotiate on behalf of the Settlement Class, through their investigation, research, and discovery efforts. *See T.K. Through Leshore v. Bytedance Tech. Co.*, No. 19-cv-7915, 2022 WL 888943, at *11 (N.D. Ill. Mar. 25, 2022) ("Courts may consider a number of factors when evaluating the adequacy of representation, including the "nature and amount of discovery," which "may indicate whether counsel negotiating on behalf of the class had an adequate information base." (quoting Fed. R. Civ. P. 23(e)(2)(A) Advisory Committee's notes to 2018 amendment)); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 966 (N.D. Ill. 2011) (approving settlement given "considerable, extensive informal discovery").

Likewise, the Plaintiffs have been actively engaged—they each spent considerable time representing the Settlement Class over the past two years and undertook reputational risks by lending their names to these actions. Among other things, Plaintiffs: (1) provided documents and information about their experiences to counsel; (2) reviewed pleadings and other documents; (3) regularly communicated with counsel about the status of the litigation and settlement negotiations; and (4) reviewed and approved the proposed settlement agreements.[10]

**B.** **The Settlement Is the Product of Arm's-Length Negotiations (Rule 23(e)(2)(B)).**

The Settlement presented for the Court's consideration is the product of extensive, arm's-length negotiations through an experienced and highly regarded mediator, Hon. Jay C. Gandhi (Ret.) of JAMS. Joint Decl. ¶¶ 29–35. That included three separate in-person, full-day mediation sessions with Judge Gandhi over the course of multiple months, and numerous

---

[10] *See* Joint Decl., Exs. 7–11 (Plaintiff declarations).

additional meetings and calls (at times, multiple per day). *Id*. ¶ 27. Prior to the mediation sessions, the parties submitted mediation briefs and supplemental submissions, and provided and analyzed pertinent data and information relevant to evaluating, valuing, and resolving the claims. After the parties initially reached an agreement in principle, the parties continued to work diligently to negotiate and prepare the written settlement agreement, Methodology, Notice Program, claim process, notice and claim forms and other settlement exhibits, among other details. *Id*. ¶ 31. The parties then worked extensively on the modifications to the Settlement, Methodology, and notice and claims process, after Discover identified the additional data following the Court's original preliminary approval order. *Id*. ¶¶ 49–53.

The product of those extensive efforts is reflected in the Settlement. At all times, the settlement negotiations were adversarial, non-collusive, and conducted at arm's-length. Joint Decl. ¶ 35; *see also In re TikTok*, 617 F. Supp. 3d at 934 (identifying third-party mediation and arm's-length negotiation as "indicia of trustworthiness . . . work[ing] against any suggestion of impropriety").

### C. The Settlement Represents a Strong Result for the Settlement Class, Particularly Given the Risks and Likely Duration of Ongoing Litigation (Rule 23(e)(2)(C)(i); *Wong Factors* 1 and 2).

"The most important factor relevant to the fairness of a class action settlement is . . . the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, 332 F.R.D. 202, 217–18 (N.D. Ill. 2019) (quoting *Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)). Courts instruct that in considering this factor, "parties must compromise to reach a settlement" and, thus, "courts need not—and indeed should not—'reject a settlement solely because it does not provide a complete victory to plaintiffs." *T.K. Through Leshore*, No.

19-cv-7915, 2022 WL 888943, at *14 (quoting *In re Capital One Tel. Consumer Prot. Act. Litig.*, 80 F. Supp. 781,790 (N.D. Ill. 2015)).

The Settlement here represents a very strong result for the Settlement Class. Pursuant to the Settlement, eligible Settlement Class Members will receive payments calculated based on 100 percent of the approximate fee overcharges they incurred during the relevant time period (2007–2023), plus interest running through the Escrow Final Funding Date,[11] with Discover paying a ***minimum*** of $540 million to affected entities. Settlement § 3.5.5. While the Court is not required to compare the result here, quantitatively, to potential outcomes in order to evaluate the strength of the result,[12] such a comparison strongly supports granting approval here. The Settlement here also compares favorably to other settlements approved in this District where the recovery represented a far lower percentages of potential damages. *See, e.g., In re Capital One Tel. Consumer Prot. Act. Litig.*, 80 F. Supp. 3d at 789 (approving settlement in which each class member would receive $34.60, compared to the $500 statutory recovery possible through continued litigation); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 228 (N.D. Ill. 2016) (similar); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 582 (N.D. Ill. 2011) (approving

---

[11] Settlement Payment amounts are subject to potential pro rata increase or reduction (i.e., based on the Minimum Total Class Payout and Total Settlement Payout provisions), however given that the Total Settlement Payout figure is based on the total of all MID Amounts calculated under the Methodology, *see* Settlement § 3.5.6, it is unlikely there will be a significant, if any, pro rata decrease to the Settlement Payment amounts. The exact amount of the "Total Settlement Payout" (i.e., the ceiling) is not known because it will include additional interest amounts (i.e., for 2025 forward, through the Escrow Final Funding Date) that can only be estimated; however, including the additional interest it will be in excess of $1.3 billion. Settlement § 2.79.

[12] *See Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 285 (7th Cir. 2017) (the "evaluation of potential outcomes need not always be quantified, particularly where there are other reliable indications that the settlement reasonably reflects the relative merits of the case."); *Wong*, 773 F.3d at 864; *In re TikTok*, 617 F. Supp. 3d at 934 ("More recently, the Seventh Circuit has endorsed a less formulaic scrutiny of class action settlements when indicia of trustworthiness—third-party mediation, extensive confirmatory discovery, and hard-fought, arm's-length negotiation—work against any suggestion of impropriety.").

settlement in the amount of approximately $9.5 million, about 10 percent of the approximate potential damages).

### 1.    The Costs, Risks, and Delay of Trial and Appeal (Rule 23(e)(2)(C)(i); *Wong* Factor 2).

This is a strong result for the Settlement Class, particularly given the substantial risks and challenges it faced of continued litigation.  From the outset, Discover sought discovery regarding a potential motion to compel arbitration, which if successful could, alone, have at least substantially impacted the cases and delayed the litigation (and any potential recovery) by a year or more.  Joint Decl. ¶¶ 19–20, 74.  Discover also made clear that it would vigorously defend this case on the merits, and planned to seek an offset for what it asserted were certain *under*charges stemming from misclassifications.  *Id*. ¶ 74.  Among the other merits issues, Discover made clear that it would vigorously defend against allegations that it violated federal and state statutes and common law, and disputed the premise that it had a legal obligation to Settlement Class Members in implementing its internal classification system.  *Id*.  Moreover, Discover has made clear that it would oppose certification of a litigation class.  Even if Plaintiffs were able to overcome these challenges, and prevail at trial on the merits, they would have faced an inevitable appeal.  *Id*.

While Plaintiffs believe they could overcome these challenges, they are indicative of the risks that Plaintiffs and the proposed Settlement Class would face if the litigation were to continue.  The proposed Settlement provides substantial, appropriately tailored relief while allowing Settlement Class Members to avoid the risks of unfavorable, and even potentially dispositive, rulings on these and other issues.

Another major benefit of the Settlement is that it helps the Settlement Class avoid further delay in obtaining relief.  Proceeding with the litigation could add years to the resolution, given

the legal and factual issues raised and likelihood of appeals.  *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) ("Even if Plaintiffs were to succeed on the merits at some future date, a future victory is not as valuable as a present victory").  Avoiding further delay is particularly beneficial in this case, given the alleged overcharges occurred as many as 17 years ago, meaning that as time passes, it is going to get harder to track down and pay entities in the Settlement Class.

### 2. The Method of Distributing Relief Is Effective (Rule 23(e)(2)(C)(ii)).

The method for distributing the settlement payments—direct payments via mailed checks or (at the claimant's election) electronic ACH—further supports the reasonableness of the Settlement.  Moreover, while a claim is required for most Settlement Class Members, the Settlement is well crafted to notify Settlement Class Members, encourage claims, and limit what is required of claimants to what is reasonably necessary for the Settlement Administrator to validate claims and calculate and allocate payment amounts in light of the limitations of Discover's data.  *See supra* Background § III.B.2.

To the extent claims are required, Settlement Class Members can submit them by mail or electronically via the Settlement Website.  With respect to online claims, the direct mail and email notices include unique claimant ID and PIN numbers, allowing for pre-population of certain data fields with information available to the Settlement Administrator.  Email notices also include links to the webpage where claims can be submitted electronically, and mailed notices include hard copy claim forms and instructions for how to submit claims electronically.

Additionally, the utilization of the Settlement Base Payment will help ensure that none of the payments distributed are negligible and that recipients are likely to negotiate their payment checks.

### 3. The Terms of Any Proposed Award of Attorney's Fees (Rule 23(e)(2)(C)(iii)).

Pursuant to their Motion for an Award of Attorneys' Fees, Costs, and Service Awards, filed concurrently herewith, Settlement Class Counsel are requesting an award of attorneys' fees in an amount of $25 million, plus reimbursement of $307,158.03 in litigation expenses. Any fees and expenses awarded by the Court will be paid by Discover **on top of** (i.e., in addition to) the Settlement Payments to Settlement Class Members, within 14 days after entry of the Judgment. Settlement §§ 3.6.1, 3.6.3. As discussed in the accompanying fee motion, the amounts requested are reasonable and justified under applicable standards and the circumstances of this litigation. Settlement Class Counsel's fee motion will be available on the Settlement Website, and Settlement Class Members have the opportunity to comment on or object under Fed. R. Civ. P. 23(h) prior to the Final Approval Hearing.[13]

### 4. There Are No Additional Agreements to Disclose (Rule 23(e)(2)(C)(iv)).

Plaintiffs must identify any agreements "made in connection with the proposal." Fed. R. Civ. P. 23(e)(3); *see* Fed. R. Civ. P. 23(e)(2)(C)(iv). This provision is aimed at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." Fed. R. Civ. P. 23(e)(2), 2003 adv. comm. note. There are no such agreements to disclose.

---

[13] When the settlement was modified (i.e., following Discover's identification of additional data for years 2007–2015), the settlement's terms regarding attorneys' fees and expenses were not changed, despite the additional efforts required and the significant additional benefits negotiated for the Settlement Class in connection with the modified settlement. Joint Decl. ¶ 55.

**5. The Settlement Treats Settlement Class Members Equitably (Rule 23(e)(2)(D)).**

The Settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The MID Amounts and payments will be calculated pursuant to the same Methodology and allocation process, with each recipient's Settlement Payment based on the approximate interchange fee overcharges they incurred during the relevant time period as best determined by the Settlement Administrator using all the available information. While the claim and informational requirements do vary by entity type, those differences are fair and equitable, and indeed, as discussed above, are necessary for the Settlement Administrator to make eligibility, calculation, and allocation determinations in light of the limitations of Discover's own data.

**6. The Settlement Class's Response to Date and the Opinion of Competent Counsel Also Support Final Approval (*Wong* Factors 3, 4, and 5).**

The reaction of the Settlement Class to date has been very positive. The Settlement Class includes millions of businesses. The Settlement Administrator has disseminated millions of mail and email notices, and commenced the extensive media and digital notice campaign. *See* Azari Decl. ¶ 8. The notices describe the essential terms of the Settlement, and inform Settlement Class Members of their right to opt–out of the Settlement Class or object to any aspect of the Settlement. The deadline for Settlement Class Members to opt-out or object is March 25, 2026. PAO ¶ 33.

As of November 24, 2025, no objections to the Settlement have been received and only 49 opt-out requests have been submitted. Azari Decl. ¶ 85. *See Bytedance*, 2022 WL 888943, at *16 ("[T]he fact that so few members of the Proposed Settlement Class objected to or opted out

of the Proposed Settlement suggests strong support.").  Plaintiffs will update the Court regarding the opt-outs, objections, and claims in advance of the Fairness Hearing.

Additionally, Settlement Class Counsel in this case have extensive experience litigating complex class actions[14] and have a deep understanding of the facts, strengths, and risks in this litigation.  Their support for the Settlement as fair, reasonable, and adequate, further supports granting final approval.  Joint Decl. ¶ 78; *In re TikTok*, 617 F. Supp. 3d at 938.

## II.   **The Court Should Re-Affirm Certification of the Settlement Class.**

The Court previously certified the Settlement Class, for settlement purposes, finding that the factors for certification under Rules 23(a) and 23(b)(3) were satisfied.  PAO ¶ 5.  The facts and analysis supporting that finding remain unchanged.  *See CAPP*, ECF No. 59, at 30–33 (discussing application of the class certification factors).  Accordingly, the Court should re-affirm certification of the Settlement Class for settlement purposes.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order (1) granting final approval of the Settlement as fair, reasonable, and adequate; and (2) re-affirming certification of the Settlement Class.

---

[14] Joint Decl., Ex. 2 ("Pratsinakis Decl.") ¶¶ 2–5; Joint Decl., Ex. 3 ("Heller Decl.")  ¶¶ 2–4; Joint Decl., Ex. 4 ("Kick Decl.") ¶¶ 2–4.

Dated: December 1, 2025

Respectfully submitted,

By: */s/ Catherine Pratsinakis*
Catherine Pratsinakis
Nina C. Spizer
DILWORTH PAXSON LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7000
Facsimile: (215) 575-7200
cpratsinakis@dilworthlaw.com
nspizer@dilworthlaw.com

By: */s/ Roger N. Heller*
Roger N. Heller (pro hac vice)
Michael K. Sheen (pro hac vice)
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: (415) 956-1000
Fax: (415) 956-1008
rheller@lchb.com
msheen@lchb.com

Margaret M. Becko (pro hac vice)
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel.: (212) 355-9500
Fax: (212) 355-9592
mbecko@lchb.com

By: */s/ Taras Kick*
Taras Kick (pro hac vice admitted)
Tyler Dosaj (pro hac vice admitted)
THE KICK LAW FIRM, APC
815 Moraga Drive
Los Angeles, California 90049
Tel: (310) 395-2988
Fax: (310) 395-2088
Taras@kicklawfirm.com
Tyler@kicklawfirm.com

*Settlement Class Counsel*

## <u>CERTIFICATION PURSUANT TO GENERAL ORDER 16-0020</u>

I hereby certify that the content of the document is acceptable to all persons required to sign the document, and all such persons have consented to inclusion of their electronic signatures on the document.


Dated: December 1, 2025                                             */s/ Catherine Pratsinakis*